UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARYANN CASTORENA,

      Petitioner,         CASE NO. 2:17-cv-13301
v.                             HONORABLE DENISE PAGE HOOD
                                MAGISTRATE JUDGE ANTHONY P. PATTI
SHAWN BREWER,

      Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION
## FOR A WRIT OF HABEAS CORPUS AND DENYING
## A CERTIFICATE OF APPEALABILITY

This is a habeas corpus case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Maryann Castorena ("Petitioner") was convicted of first-degree premeditated murder, Mich. Comp. Laws § 750.316(1)(a), conspiracy to commit first-degree premeditated murder, Mich. Comp. Laws §§ 750.157a and 750.316(1)(a), solicitation of first-degree premeditated murder, Mich. Comp. Laws § 750.157b(2), and lying to a peace officer, Mich. Comp. Laws § 750.479c(2)(d), following a jury trial in Ottawa County Circuit Court. Petitioner alleges as a ground for relief that evidence admitted at trial relating to a prior conspiracy to commit arson was wrongfully admitted under Michigan Rule of Evidence ("MRE") 404(b). Petitioner also alleges that the evidence violated her right to a

fair trial under the Sixth and Fourteenth Amendments to the United States Constitution.

The State argues in an answer to the habeas petition that Petitioner abandoned her claim by presenting it in a one-sentence statement with no supporting argument. The State also maintains that Petitioner's claim is not cognizable on habeas review because there is no federal prohibition on the evidence in question in the habeas context.

## I. BACKGROUND

Petitioner was charged with first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, solicitation of first-degree premeditated murder, and lying to a peace officer. She was tried before a jury in Ottawa County Circuit Court. The state appellate court summarized the facts at Petitioner's trial as follows:

> This case arises out of the murder of Jose Hernandez in January 2014. At the time, defendant was a beneficiary of Hernandez's life insurance policies as well as the 401k account, stock option plan, and life insurance policy that Hernandez received through his job. In total, defendant was in a position to receive over $1.2 million upon Hernandez's death.
>
> In 2005, defendant and Hernandez began dating, and they later lived together along with other family members. In June 2012, Hernandez applied for a $750,000 20-year term life insurance policy through a Farm Bureau Insurance agency where defendant worked. He named his niece as the sole beneficiary of the policy, but he asked the

insurance agent about the possibility of changing the beneficiary at a later date to his future wife and children. This insurance policy went into effect on July 20, 2012.

Later, in November 2012, defendant, Hernandez, and defendant's sons, Jamie Hinojosa and Gabriel Delarosa, were living in an apartment on Ambertrace Lane in Holland, Michigan ("the Ambertrace apartment").[1] At that time, defendant was introduced to one of Hinojosa's friends, Anthony Delagarza, who was an initiated member of the Latin Kings, a local gang. Delagarza was living with his brother, but he wanted to move out because he was "hanging around with a lot of gang members" at his brother's apartment and hoped to "turn [his] life around." Learning of this, defendant invited Delagarza to live with her, Hernandez, and her sons at the Ambertrace apartment. Delagarza moved into the unit shortly thereafter, and he was "jumped out" of the Latin Kings, meaning that he was assaulted in order to be allowed to leave the gang, in December 2012.

In February 2013, Hernandez listed defendant as the only beneficiary of his employee stock options plan, his 401k plan, and his life insurance policy issued through his employer. A month later, in March 2013, defendant asked Delagarza if he knew of anyone who could "total out the [2012 Nissan Maxima] so the insurance would pay out" because they were having trouble paying for the insurance on the vehicle each month. Hernandez was with defendant when she discussed this matter with Delagarza, but defendant was the one who spoke while Hernandez stood nearby. Delagarza told defendant that he did not know anyone who would do that, but he could do it. Defendant then told him, "I'll pay you about $1,000 for this job." Delagarza testified that the "cover story" that defendant developed for the arson involved defendant staying at her sister's house—as her sister was in the midst of a custody dispute with her ex-husband—and making it appear that the ex-husband committed the arson. At trial, Delagarza confirmed that he did, in fact, blow up the vehicle using

---

[1] At the time, defendant and Hernandez held a renter's insurance policy for the apartment through Farm Bureau, and Hernandez held an automobile insurance policy for a 2012 Nissan Maxima.

Molotov cocktail bombs while it was parked outside the home of defendant's sister. He also explained in detail the way in which the arson plot was executed, including defendant's presence at her sister's home during the commission of the crime. In addition, documentation regarding the insurance claim filed on the vehicle, testimony from a police officer who responded to the scene of the arson, and a video of the burning vehicle were admitted at trial. After the incident, defendant paid Delagarza for his involvement in the crime.

In April 2013, approximately $40,000 was paid to Hernandez for the total loss of the 2012 Nissan Maxima. Later in April, Hernandez changed the designated beneficiary on his Farm Bureau life insurance policy so that his niece would receive 60% of the proceeds and defendant would receive 40%.

In July 2013, Delagarza moved out of the Ambertrace apartment. That month, he also traveled to California. While he was visiting his godparents during the trip, he accidentally videotaped himself on his cellular telephone while discussing the fact that defendant hired him to burn the Maxima, and he described the way he did the crime. Around the same time, defendant also moved to California. At the end of July 2013, she married another man in Nevada, which she never disclosed to Hernandez.

A few days after the marriage, defendant temporarily returned to Michigan to help Delarosa move in with one of defendant's sisters.[2] During her visit, she reconnected with Delagarza, requesting that he meet with her the following weekend. During the meeting, defendant told Delagarza that she had a new "job" for him to do and that it would pay out "really, really good." Delagarza testified at trial that defendant explained that she would "have [Hernandez] take out a $75,000 life insurance policy," and that Delagarza would be paid $50,000 for murdering him. They then discussed how the murder would be accomplished, and Delagarza agreed to complete the homicide. Subsequently, defendant returned to California.

---

[2] Hinojosa continued to live with Hernandez.

The murder did not occur until several months later.[3] In the meantime, Hernandez applied for a second 20-year term life insurance policy in the amount of $750,000 through Farm Bureau, under which defendant was the sole beneficiary.[4] Additionally, during this period of time, Hernandez continued to refer to defendant as his girlfriend.

In November 2013, defendant moved back to Holland, Michigan, with her new husband. Upon their arrival, defendant and her husband lived in her sister's home. Hinojosa continued to live with Hernandez in the Ambertrace apartment despite his mother's return to Michigan. Defendant met with Delagarza multiple times in November and December 2013 to discuss the murder plan. Then, around Christmas, while Hinojosa was still living with Hernandez, defendant began visiting the Ambertrace apartment on a regular basis to sort through her possessions and move them out of the residence.

On January 2, 2014, Hernandez paid the premium on his second life insurance policy through Farm Bureau, which extended the coverage for three months. The next day, he changed the beneficiary designation on his first life insurance policy, making his niece and defendant equal beneficiaries.

In the evening on January 5, 2014, after meeting with Delagarza earlier in the day, defendant borrowed a family member's Chevy Avalanche and drove Delagarza to the Ambertrace apartment for the commission of the murder. Delagarza hid in the parking lot until Hernandez exited the apartment building and murdered him using a ball joint remover with a broken prong. Delagarza then ran back to the Avalanche, where defendant was waiting. Immediately thereafter, defendant drove Delagarza to a predetermined location to throw away the weapon.

---

[3] During one of these meetings, defendant showed Delagarza a note that had logistical details concerning the planned homicide. This note was later found inside a bag that was located in defendant's room at her sister's house.

[4] Hernandez told the insurance agent not to tell defendant about this policy, and the agent testified at trial that he never told her about it.

*People v. Castorena*, No. 325786, 2016 WL 2908336, at *1-2 (Mich. Ct. App. May 17, 2016) (unpublished) (footnotes in original).

Petitioner chose not to testify at trial. Her theory of the case was that Delagarza independently executed the murder and that he was simply blaming her to receive a reduced sentence pursuant to a plea agreement he negotiated after he was charged with the murder. Petitioner "contested the existence of any conspiracy to murder Hernandez and disputed the fact that she had any involvement in the homicide." *Id.* at *4.

The jury found Petitioner guilty, as charged, of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, solicitation of first-degree premeditated murder, and lying to a peace officer. The trial court sentenced Petitioner to life imprisonment without parole for her murder conviction, life imprisonment with the possibility of parole for the conspiracy conviction, 180 to 540 months' imprisonment for her solicitation-of-murder conviction, and 17 to 48 months' imprisonment for her lying-to-a-peace-officer conviction. The Michigan Court of Appeals affirmed Petitioner's convictions in an unpublished decision, *see id.* at *1, and on September 27, 2016, the Michigan Supreme Court denied leave to appeal because it was not persuaded to review the question presented to it. *See People v. Castorena*, 500 Mich. 869; 885 N.W.2d 293 (2016).

On October 9, 2017, the habeas corpus petition was filed on behalf of the petitioner through counsel.

## II.  STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the Court may grant an application for the writ of habeas corpus only if the state court's adjudication of the prisoner's claims on the merits

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-

court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103.

### III. DISCUSSION

Petitioner contends that the trial court abused its discretion by allowing 404(b) ("other acts") evidence to be admitted against her. The "other acts" evidence pertained to Petitioner's and Delagarza's conspiracy to commit arson in March 2013. At that time, defendant "asked Delagarza if he knew of anyone who could 'total out the [2012 Nissan Maxima] so the insurance would pay out' " since they were experiencing difficulty paying the vehicle's insurance each month. *Castorena*, 2016 WL 2908336 at *1. Petitioner agreed to pay Delagarza $1,000 to complete the arson. *Id*. At trial, Delagarza confirmed that he blew up the car

8

"using Molotov cocktail bombs," and he gave a detailed explanation regarding the execution of the arson plot. *Id.* Insurance documents, testimony of the police officer who responded to the fire, and video footage of the burning vehicle also were admitted at trial. *Id.* Petitioner maintains that this evidence should have been excluded and that she is being detained unconstitutionally as a result.

## A. The State-Court Decisions

The trial court admitted the "other acts" evidence on grounds that (i) the evidence was offered for a proper purpose under MRE 404(b) to show a common plan or scheme, (ii) it was relevant under MRE 402, and (iii) it would not confuse the jury or hinder the trial. *See People v. Castorena*, No. 14-38482-FC, Op. and Order (Ottawa Cty. Cir. Ct. Oct. 2, 2014). The Michigan Court of Appeals subsequently determined that the trial court admitted the evidence for a proper non-propensity purpose under MRE 404(b). *Castorena*, 2016 WL 2908336 at *3. The Court of Appeals also stated that evidence of the conspiracy to commit arson to obtain insurance proceeds was highly relevant as it "made the existence of the fact that defendant and Delagarza intentionally entered into an agreement to murder Hernandez—also to acquire insurance proceeds—significantly more probable." *Id*. at *4.

## B.  Habeas Review of Evidentiary Claims

This Court finds no merit in Petitioner's claim because "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts evidence." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  Although "the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, see *Old Chief v. United States*, 519 U.S. 172, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988), it has not explicitly addressed the issue in constitutional terms." *Id*. at 513.  As such, the state trial court's decision to admit "other acts" evidence, and the state appellate court's rejection of Petitioner's claim, were not contrary to, or unreasonable applications of, any Supreme Court decision under § 2254(d)(1).

Even if Petitioner's claim were cognizable on habeas review, "states have wide latitude with regard to evidentiary matters under the Due Process Clause." *Wilson v. Sheldon*, 874 F.3d 470, 476 (6th Cir. 2017) (citing *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000)).  "Trial court errors in state procedure and/or evidentiary law do not rise to the level of federal constitutional claims warranting relief in a habeas action unless the error renders the proceeding so fundamentally

unfair as to deprive the petitioner of due process under the Fourteenth Amendment." *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir. 2004) (quoting *Estelle v. McGuire*, 502 U.S. 62, 69-70) (1991); *see also Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010)("[W]e cannot grant the writ based on our disagreement with 'state-court determinations on state-law questions,' *Estelle v. McGuire,* 502 U.S. 62, 68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), unless the state-court determination is so 'fundamentally unfair' that it deprives a defendant of due process, *Bey v. Bagley,* 500 F.3d 514, 519-20 (6th Cir. 2007).").

In Michigan, the test to determine whether evidence regarding a prior crime should be admitted under MRE 404(b) is three-pronged. The evidence is admissible "if (1) it is offered for a proper, noncharacter purpose, (2) it is relevant to a factual issue of consequence at trial, and (3) the probative value of the evidence is not substantially outweighed by the potential for unfair prejudice under MRE 403." *Castorena*, 2016 WL 2908336, at *3 (citing *People v. Sabin* (After Remand), 463 Mich. 43, 55-56; 614 N.W.2d 888 (2000) (citing MRE 104(b), MRE 402, MRE 403, MRE 404(b), and *People v. VanderVliet*, 444 Mich. 52, 74-75; 508 N.W.2d 114 (1993), amended 445 Mich. 1205 (1994)).

The trial court properly concluded that the three-pronged test for admitting "other acts" evidence was met. First, as explained by the Michigan Court of

Appeals, the evidence was admitted for the following proper purposes: (i) to show the ongoing conspiratorial relationship between Petitioner and Delagarza; (ii) to provide proof for Petitioner's motive; and (iii) to provide proof of Petitioner's common plan, scheme or system in carrying out both offences. *Id*.

Second, the evidence was relevant to factual issues of consequence at trial. Evidence of the prior conspiracy to commit arson "was relevant to show [Petitioner's] relationship with Delagarza, her motive in committing the crimes, and a common plan, scheme, or system." *Id*. at *5.

Third, Petitioner's and Delagarza's "ongoing conspiratorial relationship[] was highly probative given [Petitioner's] theory that she had no involvement in the commission of the murder and that Delagarza was blaming her for the murder that he committed." *Id*. The danger of unfair prejudice, moreover, was mitigated by the trial court's charge to the jury, which was very clear in regards to how the jurors should consider the "prior act" evidence in relation to the charges Petitioner was facing. The trial judge read the following instruction to the jury:

> You have heard evidence that was introduced to show that the defendant committed a crime of aiding and abetting an arson for which she is not on trial. If you believe this evidence, you must be very careful only to consider it for certain purposes. You may only think about whether the evidence tends to show that the defendant used . . . a plan, system, or a characteristic scheme that she has used before or since, and the nature and extent of defendant's conspiratorial relationship with Anthony Delagarza.

> You must not consider the evidence for any other purpose. For example, you must not decide that it shows the defendant is a bad person or that she's likely to commit crimes. You must not convict the defendant here because you think she is guilty of other bad conduct. All of the evidence must convince you beyond a reasonable doubt that the defendant committed the alleged crime, or you must find her not guilty.

11/12/14 Trial Tr., pp. 187-188.

For the reasons given by the Michigan Court of Appeals, it was not fundamentally unfair to admit evidence regarding Petitioner's and Delagarza's conspiracy to commit arson. The evidence was admitted for a proper purpose, it was relevant, it had significant probative value, and the danger of unfair prejudice was mitigated by the trial court's jury instruction on "other acts" evidence. Accordingly, habeas relief is not warranted on Petitioner's claim.

## IV. CONCLUSION AND ORDER

For the reasons stated above, Petitioner's claim is not cognizable on habeas review and, even if it were, the claim lacks merit, and Petitioner is not entitled to federal habeas relief. The state appellate court's adjudication of Petitioner's claim on the merits was not contrary to Supreme Court precedent or an unreasonable application of Supreme Court precedent. Accordingly, the Court DENIES and DISMISSES WITH PREJUDICE the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of [her] constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Having conducted the requisite review, the Court concludes that Petitioner fails to make a substantial showing of the denial of a constitutional right. Accordingly, the Court **DECLINES** to issue a certificate of appealability.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: June 29, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 29, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager